**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **STRAGENT LLC, et al.,** | § | |
| | § | **NO. 6:11cv278 LED-JDL** |
| **v.** | § | |
| | § | **LEAD CASE** |
| **BMW NORTH AMERICA LLC, et al.** | § | |

| | | |
|---|---|---|
| **STRAGENT LLC, et al.,** | § | |
| | § | **NO. 6:13cv378 LED-JDL** |
| **v.** | § | |
| | § | **MEMBER CASE** |
| **MERCEDES-BENZ USA, LLC.** | § | |

| | | |
|---|---|---|
| **STRAGENT LLC, et al.,** | § | |
| | § | **NO. 6:13cv379 LED-JDL** |
| **v.** | § | |
| | § | **MEMBER CASE** |
| **CHRYSLER GROUP, LLC.** | § | |

## MEMORANDUM OPINION AND ORDER

This claim construction opinion construes the disputed claim terms in U.S. Patent No. 7,953,599 ("the '599 patent").   Plaintiffs Stragent LLC and TAG Foundation (collectively "Stragent") allege that Defendants[1] infringe the '599 patent.   The parties have presented their claim construction positions (Doc. Nos. 346, 352, 355 & 359).[2]   On February 28, 2013, the Court held a claim construction hearing.   For the reasons stated herein, the Court adopts the constructions set forth below.

---

[1] Defendants include BMW of North America, LLC; Bayerische Motoren Werke A.G.; Chrysler Group LLC; Mercedes-Benz USA, LLC; and Mitsubishi Motors North America, Inc.  Defendant Mitsubishi Motors North America, Inc. has since been dismissed (Doc. No. 374).

[2] On May 8, 2013, after claim construction briefing had completed and the Court had conducted a *Markman* hearing, the Defendants were severed into separate civil actions.  All Defendants were then consolidated into Civil Action No. 6:11cv278 (Doc. No. 379).  Any reference to claim construction briefing shall refer to documents within Civil Action No. 6:11cv278.

## OVERVIEW OF THE PATENT

The '599 patent—a child of U.S. Patent No. 7,424,431 ("the '431 patent")—is directed to a "System, Method and Computer Program Product for Adding Voice Activation and Voice Control to a Media Player."  A command for a media player is generated by an utterance, i.e., voice command.  *See* '599 patent, ABSTRACT.  The command is then used to control a media player.  *Id.*

Stragent accuses Defendants of infringing independent claims 1, 41, and 76, and the dependent claims therefrom.  Independent Claim 1, set forth below, contains many of the terms in dispute (set forth in bold):

> 1. A computer program product embodied on a non-transitory computer-readable medium, comprising:
> computer code for controlling a media player adapted for playing stored music, the media player capable of communicating with a memory, a speaker, and a microphone;
> computer code for initializing a plurality of program variables stored in the memory, the program variables including at least one of artists, songs, or playlists;
> computer code for receiving a **trigger signal**;
> computer code for receiving an utterance intended to control the media player in association with the stored music;
> computer code for verifying the utterance using the speaker;
> computer code for generating a corresponding command for the media player based on the utterance, **the corresponding command selected from a command set including at least a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command**; and
> computer code for channeling output of the **media player**;
> wherein the computer program product is operable such that the corresponding command enables **wireless control** of the media player.

'599 patent at 7:55-8:12.

2

## CLAIM CONSTRUCTION PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).   The Court examines a patent's intrinsic evidence to define the patented invention's scope.   *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).   Intrinsic evidence includes the claims, the rest of the specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.   The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.   *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."   *Id.*   Differences among claims, such as additional limitations in dependent claims, can provide further guidance.  *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).   "[T]he specification 'is always highly relevant to the claim construction analysis.   Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp.v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v.Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).   In the specification, a patentee may define his own

terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). The well established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v.*

4

*Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance.  *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 994 (Fed. Cir. 2003) ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)).  "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover."  *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988) (quotation omitted).  "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution."  *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art."  *Phillips*, 415 F.3d at 1317 (quotation omitted).  Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful."  *Id.*  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id.*

**DISCUSSION**

I.   **"the corresponding command selected from a command set including at least a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command"[3]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| computer code for generating one or more commands for the media player based on the utterance, the one or more corresponding commands selected from the following command set: a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command | a command selected from a conjunctive set of commands including at least the following: play, pause, shuffle, artist, song, and playlist |

The parties dispute whether the "command set" requires computer programming for generating responses to all six of the listed commands or merely one of the six enumerated commands. PLTFF'S BRIEF AT 11; RESPONSE AT 7.  Defendants contend the plain language of the claims require a reading that the command set must include all of the six commands listed. RESPONSE AT 7.  In particular, Defendants argue that Claims 1 and 41 recite "at least" and "and" to show that the command set must include, at minimum, a play, pause, shuffle, artist, song, and playlist command.  *Id.* at 7-8.  Further, Claim 76 uses the phrases "at least one of" and "or" to specify that only one of the commands must be included in the command set to satisfy the elements of Claim 76.  Such a contrast in claim language indicates the patentee intended to require that the command set of Claims 1 and 41 include all of the recited commands.  *Id.* at 8.

Moreover, Defendants contend that the prosecution history makes clear that the command set recited in Claims 1 and 41 require inclusion of all six commands.  During prosecution of the '599 patent's parent, the '431 patent, the patentee distinguished a prior art reference, stating that the reference "fail[ed] to even suggest . . . a command set including a <u>play command</u>, a <u>pause command</u>, a <u>shuffle command</u>, a <u>playlist command</u>, an <u>artist command</u>, and a <u>song command</u>."

---

[3] This term is contained in Claims 1 and 41.

*Id.* at 10-11 (emphasis in original) (citing EXS. 16-17, ATTACHED TO RESPONSE).  Such emphasis indicates the collective importance of all six commands within the '431 patent.  *Id.*  Moreover, during prosecution of the '599 patent, the examiner noted that prior art disclosed "a command set of at least 'a play command,' 'an artist command,' and 'a song command.'"  *Id.* at 11 (citing EX. 12, ATTACHED TO RESPONSE).  Defendants argue the patentee distinguished the prior art by adding the language "at least" and "and" to the claims to highlight that the limitation requires all six of the listed commands.  *Id.*

Stragent responds that only one command need be selected.  REPLY AT 4.  In other words, so long as the command selected is one of the following: a play, pause, shuffle, artist, song, or playlist command, the claim limitation is met.  *Id.*  However, there is no requirement that the computer program include code for generating all six of the commands recited in Claims 1 and 41.  *Id.*  Further, Stragent argues the prosecution history merely indicates that the examiner interpreted the claim language to require generation of only one of the listed commands, and further, that the command phrase was not relied on to distinguish the prior art.  *Id.* at 5 (citing EX. 18, ATTACHED TO RESPONSE).  Finally, Stragent maintains that the '599 patent uses "or" and "and" interchangeably, signifying that only one of the listed commands need be included in the command set to meet the claim limitation.  PLTFF'S BRIEF AT 11 (citing '599 patent at claims 28, 68 & 133; 2:33-3:18).

As stated above, the parties disagree whether the command set recited in Claims 1 and 41 requires at least all six command types, or simply one.  In short, the command set must include at least a play, pause, shuffle, artist, song, and playlist command.  The plain language of the claims requires as much:

> computer code for generating a corresponding command for the media player based on the utterance, the corresponding command selected from a command set

> including *at least* a play command, a pause command, a shuffle command, an artist command, a song command, *and* a playlist command.

'599 patent at 8:3-8 (Claim 1) (emphasis added); 10:41-46 (Claim 41).  The use of "at least" and "and" indicate that, at minimum ("at least"), the command set must include all of the following commands: a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command.  *See Phillips*, 415 F.3d at 1312 ("[T]he words of a claim 'are generally given their ordinary and customary meaning.'" (internal citations omitted)).  The use of "and" at the end of the recited list designates the list as conjunctive.  *See SuperGuide Corp. v. DirecTV Enter., Inc.*, 358 F.3d 870, 885 (Fed. Cir. 2004) (concluding the use of "and" connotes a conjunctive list).

Moreover, the other claims of the '599 patent support the conclusion that the command set of Claims 1 and 41 must include, at minimum, the six disclosed command types.  For example, Claim 76, while similar to Claims 1 and 41, uses the disjunctive to indicate that all of the command types recited are not necessary:

> computer code for generating a corresponding command for the media player based on the utterance, the corresponding command selected from a command set of a plurality of commands including *at least one of*: a play command, a pause command, a forward command, a rewind command, an on command, an off command, a shuffle command, a repeat command, a search command, a volume up command, a volume down command, a playlist command, *or* a next command.

'599 patent at 12:47-56 (emphasis added).  Claim 76 simply requires that "at least one of" the listed commands be included in the command set; the disjunctive "or" at the conclusion of the list of command types reinforces the idea that only one of the recited command types must be included in the command set.  Such language differs from that used in Claims 1 and 41, highlighting the conscious choice to distinguish Claims 1 and 41 from Claim 76.  *See Phillips*, 415 F.3d at 1314-15 ("Differences among claims can also be a useful guide in understanding the

meaning of particular claim terms.").  In other words, Claims 1 and 41 require certain commands within a command set and Claim 76 merely requires selection of one command type from a particular list of possible command types.  Thus, the "at least" and "and" language of Claims 1 and 41 signify that all six of the command types must be contained within the command set.

Further examination of the patent claims does not reflect that "or" and "and" are used interchangeably, as Stragent suggests.  Claim 39, which depends on Claim 1, discusses program variables in the conjunctive: "The computer program product of claim 1, wherein the program variables include artists, songs, <u>and</u> playlists."  '599 patent at 10:19-20 (emphasis added).  In contrast, Claim 1 uses the disjunctive "or" to describe similar subject matter: "the program variables including at least one of artists, songs, <u>or</u> playlists."  *Id.* at 7:62-63 (emphasis added).  Thus, to read "and" and "or" as interchangeable would render Claim 39 superfluous.  *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Finally, the prosecution histories of the '431 and '599 patents highlight the importance of the list of particular command types.  For example, in prosecuting the '431 patent application, the patentee argued the prior art taught "voice commands including interrupt-type commands such as skipping, playing, and stopping, in addition to streaming-type commands such as louder, faster, and forward."  AMENDMENT A AT 22-23, U.S. PATENT APPL. SER. NO. 11/281,964 (JAN. 4, 2008), EX. 16, ATTACHED TO RESPONSE.  The patentee distinguished the prior art by emphasizing particular commands that did not include interrupt or streaming-type commands:

> [The prior art] simply fail[ed] to even suggest that "after verification of the utterance, generating a corresponding command for the media player based on the utterance, the corresponding command selected from a command set including a

> play command, a pause command, a shuffle command, a playlist command, an
> artist command, and a song command."

*Id.* at 23 (emphasis in original).   It was at this time that the patentee, to head off further

objections from the examiner, amended the claim to recite particular command types, rather than

simply claiming that the method generates a command for a media player based on an utterance

(amendments underlined):

> after verification of the utterance, generating a corresponding command for [[a]]
> the media player based on the utterance, the corresponding command selected
> from a command set including a play command, a pause command, a shuffle
> command, a playlist command, an artist command, and a song command.

*Id.* at 2.  Given that the patentee (1) distinguished the prior art based on command types; and (2)

amended the claim to recite a specific set of commands to be included in the command set, the

patentee emphasized the importance of having the command set contain the play, pause, shuffle,

playlist, artist, and song commands.

While the prosecution history of the '431 patent, by itself, is not limiting, the prosecution

of the '599 patent illustrates that the command set of Claims 1 and 41 must, at a minimum,

comprise the play, pause, shuffle, artist, song, and playlist commands.  Initially, claim 1 of the

'599 patent application read, in relevant part: "the corresponding command selected from a

command set including a play command, a pause command, a shuffle command, an artist

command, a song command, a playlist command."  U.S. PATENT APPL. SER. NO. 12/104,207

(APR. 16, 2008), EX. 11, ATTACHED TO RESPONSE.  Subsequently, the examiner rejected the

application, in part, because the prior art disclosed "a command set of at least 'a play command',

'an artist command', and 'a song command'."  DETAILED ACTION AT 7, U.S. PATENT APPL. SER.

NO. 12/104,207 (SEPT. 1, 2010), EX. 12, ATTACHED TO RESPONSE.  In response to the examiner's

rejection, the patentee amended the claim to include "and" so that the claim subsequently read:

"the corresponding command selected from a command set including a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command." AMENDMENT A AT 3, U.S. PATENT APPL. SER. NO. 12/104,207 (FEB. 1, 2011) (emphasis in original), EX. 13, ATTACHED TO RESPONSE; *see also id.* at 14.  The amendment implies that the conjunctive list of all six command types within the command set differentiates the '599 patent from that of the prior art, which required, at minimum, a play command, an artist command, and a song command.

Stragent maintains that the '599 patent was allowed not due to the conjunctive nature of the command set, but on alternate grounds, citing the examiner's remarks:

> Independent claims 1 and 2 appear to be allowable because the prior art of record does not disclose or reasonably suggest a combination for a computer program product or a sub-system to control a media player by utterance for wireless control of the media player that involves initializing a plurality of program variables including at least one of artists, songs, or playlists, receiving a trigger signal, and verifying an utterance using a speaker.  Although it is known to control a media player by voice in a wireless manner to play music, where the commands include at least a play command, and it is sometimes known in the prior art to receive an audible command to trigger operation, and where it is sometimes known in the prior art to verify an utterance, the prior art of record does not disclose or reasonably suggest all of the limitations in combination of initializing a plurality of program variables including at least one of artists, songs, or playlists, receiving a trigger signal, and verifying an utterance using a speaker.

DETAILED ACTION AT 7-8, U.S. PATENT APPL. SER. NO. 12/104,207 (MAR. 1, 2011), EX. 18, ATTACHED TO RESPONSE.  While the excerpt above does indicate that the '599 patent would have been allowed on grounds that did not rely on the command set, the examiner's comments were in fact directed to grounds for allowance *if* the patentee could overcome the double-patenting rejection in light of the '431 patent, the '599 patent's parent.  *See id.* at 2, 7.  In the same Office Action, the examiner rejected all claims "on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 1 to 63 of U.S. Patent No. 7,424,431," stating the

claims in the '431 and '599 patents "are not patentably distinct from each other because the corresponding claims of the ['431] patent set forth all of the same limitations as the current claims." *Id.* at 2.  The examiner specifically cited, in part, claim 1 of the '599 patent application, which recited the command set limitation: "the corresponding command selected from a command set including a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command . . . ." *Id.*

In response to the double patenting rejection, the applicant filed a terminal disclaimer and once again amended the claim, this time including the "at least" language: "the corresponding command set selected from a command set including <u>at least</u> a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command." SUBSTITUTE AMENDMENT B AT 2, 22 (emphasis in original), U.S. PATENT APPL. SER. NO. 12/104,207 (MAR. 21, 2011), EX. 14 ATTACHED TO RESPONSE.  Thus, looking at the prosecution record as a whole, it does not appear that the examiner allowed the '599 patent on grounds alternative to the command set.  Rather, in order to "clarify what is claimed," and to overcome the double-patenting rejection, the applicant added the "at least" language to the Claim 1.  *See id.* at 22-23.

Accordingly, the plain language of Claims 1 and 41, in addition to the prosecution history, dictate that "the corresponding command selected from a command set including at least a play command, a pause command, a shuffle command, an artist command, a song command, and a playlist command" be construed as "the corresponding command selected from a set of commands including at least the following: play, pause, shuffle, artist, song, and playlist." Further, the list of command-types within the command set is conjunctive.

II.     **"an assembly coupled to the automobile for receiving power therefrom and further connected to a media player adapted for playing music, the assembly including a power unit for providing the power unit to the media player, a speaker, and a microphone"[4]**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | a self-contained unit detachably coupled to, and configured to receive power from, the automobile, wherein the unit is connected to a media player adapted for playing music, and includes a speaker, a microphone, and a power unit for powering the media player |

Two issues are in dispute with respect to the "assembly" term: whether the assembly is (1) self-contained and (2) detachably coupled to the automobile. Defendants contend that the assembly is both self-contained and detachably coupled to the automobile. RESPONSE AT 18, 20. According to Defendants, Claim 76 mandates that the assembly is a structure separate from the automobile, and therefore the assembly, which includes a power unit, speaker, and microphone, must be self-contained. *Id.* at 18-19. In addition, the specification expressly states that the assembly is a separate structure that can be built-in or retrofitted to the media player. *Id.* at 19 (citing '599 patent at 3:27-29; Figures 5 & 6). Defendants further cite to the prosecution history to illustrate that the assembly must be a separate structural element. Specifically, the patentee claimed that the assembly of the '599 patent included its own speaker and microphone, whereas the assembly in the prior art did not. *Id.* at 21. Finally, Defendants maintain that the assembly should be defined as a separate structure in order to prevent Stragent from arguing that the elements of the assembly—the power unit, microphone, and speaker—can be dispersed throughout the automobile, which is inconsistent with the specification. *Id.* at 19.

Stragent, on the other hand, argues that the term requires no construction because the claim language provides the structures required to comprise the assembly: "a power unit for

---

[4] This term is contained in Claim 76.

providing the power to the media player, a speaker, and a microphone." PLTFF'S BRIEF AT 8 (citing '599 patent at 12:32-33).  Moreover, the claim language describes how the assembly is attached to the other elements of the claim: "coupled to the automobile . . . and further connected to a media player."  *Id.* (citing '599 patent at 12:29-30).  In addition, Stragent contends that Defendants are merely importing unnecessary limitations; Claim 76 does not express that the assembly must be a structure separate from the automobile. *Id.* at 8-9.  In fact, the assembly may be a part of the media player, and therefore, it need not be a self-contained unit.  *Id.* at 9 (citing '599 patent at 3:24-31).  Finally, Stragent maintains that requiring the assembly to be detachably coupled to the automobile would render Claims 10 and 50 superfluous.  *Id.*

As stated above, Stragent asserts that the claim language sufficiently informs the trier of fact as to what an "assembly" is, and therefore, the term requires no construction.  While the claim language provides some context, the language does not fully explain that the assembly is a structure separate from the automobile, rather than a variety of components within the automobile.  Consequently, construction is necessary.

Stragent's chief complaint is that the assembly should not be limited to a "self-contained unit."  Stragent contends that while some of the preferred embodiments describe a separate assembly, Claim 76 does not, and further, the '599 patent discloses that the assembly may be built-in to the media player.  PLTFF'S BRIEF AT 9.  Thus, the assembly need not be a self-contained unit.

While it does not appear that the assembly must be a "self-contained unit," the assembly is indeed separate from both the automobile and the media player.  The claim language itself implies that the assembly is a separate element: "an assembly coupled to the automobile . . . ." '599 patent at 12:29.  If various components of the assembly were separately integrated into the

automobile, there would be no need to iterate that the assembly need be coupled to the vehicle. Further, the specification notes that "the media player/assembly may be implemented in any desired environment," thus expanding the use of the invention beyond the boundaries of an automobile. *See* '599 patent at 4:41-42; *see also id.* at 5:33-37. For example, "[a]s another option, the utterance may be received utilizing an input device including a wireless device which can be positioned for optimum voice control in an automobile, an indoor environment, and/or an outdoor environment." *Id.* at 2:46-50.

In addition, the disclosure recites that "the operations of the method [for providing wireless control of a media player] of FIG. 3 may be carried out by the media player itself, and/or by way of a separate assembly that is either built-in the media player or capable of being retrofitted on the media player." '599 patent at 3:26-29 (emphasis added). Although the specification does state that the assembly containing a power unit, speaker, and microphone, may be built-in to the media player, the specification further states that said assembly is "separate" in such scenarios. Thus, both the claim language and specification note that the assembly is a unit separate from the automobile.

Moreover, the dictionary definition of "assembly" connotes a separate structure. An assembly is "the fitting together of manufactured parts into a complete machine, structure, or unit of a machine." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 73-74 (11th ed. 2003), Ex. 21, ATTACHED TO RESPONSE. Thus, the Court's interpretation of "assembly" comports with its ordinary meaning, as well as the language of the claims and the specification.

While the assembly is a unit separate from the media player and automobile, the assembly need not be "detachably coupled to" the automobile. Defendants have not provided

support to persuade the Court to import such a limitation into the claim.  Therefore, the Court declines to do so.[5]

Accordingly, the term "an assembly coupled to the automobile for receiving power therefrom and further connected to a media player adapted for playing music, the assembly including a power unit for providing the power unit to the media player, a speaker, and a microphone" means "a separate unit coupled to, and configured to receive power from, the automobile, wherein the separate unit is connected to a media player adapted for playing music, and includes a speaker, a microphone, and a power unit for powering the media player."

### III.    "trigger signal"[6]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | any word capable of initiating a voice recognition capability |

The parties disagree as to whether the trigger signal must be a word.  *See* PLTFF'S BRIEF AT 12.  Defendants contend that the trigger signal is limited to a word that activates the media player.  RESPONSE AT 12.  According to Defendants, not only is the invention directed to voice control of a media player, but the embodiments disclosed in the specification are limited to voice-activated systems using a trigger word.  *Id.* at 13 (citing '599 patent at 3:51-52; 3:47-57; 5:57-67; 6:53-59; Figs. 4, 7 & 8).  Defendants further maintain that "the clear import of the specification" overcomes any presumption of claim differentiation; because every embodiment within the '599 patent describes voice activation due to a trigger word, dependent claims cannot claim more than what is disclosed in the specification.  *See id.* at 14.

---

[5] Moreover, at the claim construction hearing, Defendants agreed to the Court's proposed construction, which omitted the "detachably coupled to" limitation.  MARKMAN TRANSCRIPT AT 37:13-16 (Doc. No. 367).  Further, at the hearing, "detachably coupled to" did not seem to be a concern for the parties, eclipsed by the issue of whether the assembly was a separate structure.  *See id.* at 37:20-53:4.
[6] This term is contained in Claims 1, 37, 41, 74, 76 & 111.

In contrast, Stragent maintains that "trigger signal" requires no construction.  PLTFF'S BRIEF AT 11.  More importantly, Stragent contends that "trigger signal" should not be limited to a word, especially because dependent Claims 31 and 32 already limit the "trigger signal" recited in Claim 1 to a "trigger word" or something audible.  *Id.* at 12.  Thus, the presumption of claim differentiation dictates that a "trigger word" is different from a "trigger signal."  *Id.*  Further, Stragent notes that the specification discloses multiple embodiments where the trigger signal is a word or a signal.  *Id.* (citing '599 patent at 3:46-67; 5:55-6:3 & 6:50-62).

The Court declines to limit "trigger signal" to a word, as Defendants propose.  Claim 1 of the '599 patent recites both a "trigger signal" and an "utterance," indicating that the voice control system may be operable via an utterance even if the trigger signal is not limited to a word:

> computer code for receiving a trigger signal;
> computer code for receiving *an utterance intended to control the media player* in association with the stored music;
> computer code for verifying the utterance using the speaker;
> computer code for generating a corresponding command for the media player *based on the utterance*. . . .

'599 patent at 7:64-8:4 (emphasis added).  The excerpt above illustrates that the command to control the media player is "based on the utterance," which connotes vocal delivery,[7] and is in accord with the many voice-activated embodiments Defendants point out in the specification. *See e.g.*, '599 patent at 5:4-9 ("a verification speaker 404 for verifying utterances received, a directional microphone 405 for receiving and transferring utterances to a processing circuit (not shown) that translates the utterances into a computer code capable of being read by the media player.").

---

[7] "The utterance may include any audible word, number, and/or sound capable of being received."  '599 patent at 2:40-41.

Further, the specification notes that a trigger signal could be something other than a word, such as a lapse in time: "As another option, a time limit (e.g. 120 seconds, etc.) may be utilized such that if no utterance is detected during operation 712 within the time limit, the method 700 [providing wireless control of a media player] may terminate, as shown in decision 716." '599 patent at 6:12-14 (referring to Fig. 7); *see also id.* at 3:64-67. Moreover, the assembly depicted in Figure 6 shows buttons associated with an FM frequency adjustment 506, and/or an FM frequency display 508 that "include up and down arrows on the front of the assembly . . . and may also include left and right channel programming capabilities." *Id.* at 5:44-47; 4:62-67; Fig. 6. These buttons could likewise create a trigger signal. Given that the specification explicitly describes a situation where the method for providing wireless control of a media player may include responses to a nonverbal signal, it would be improper to limit "trigger signal" to a word.

The prosecution history does not compel a contrary result. In its remarks, the patentee stated that "computer code for receiving a trigger signal" "may include, but is not limited to, receiving an <u>audible command</u> to trigger operation." SUBSTITUTE AMENDMENT B AT 23 (emphasis in original), U.S. PATENT APPL. SER. NO. 12/104,207 (MAR. 21, 2011), EX. 14 ATTACHED TO RESPONSE. The application was subsequently allowed. REASONS FOR ALLOWANCE AT 2, U.S. PATENT APPL. SER. NO. 12/104,207 (APR. 7, 2011), EX. 19 ATTACHED TO RESPONSE. Thus, neither the specification nor the prosecution history reflect a clear intent to restrict "trigger signal" to a word. *See Arlington Industries, Inc. v. Bridge Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.") (internal citations omitted); *Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). Defendants do not

point out any clear disclaimer within the specification or the prosecution history that would dictate a claim construction contrary to the claim language.  Thus, both the specification and prosecution history support a reading where the trigger signal may be an inaudible indicator.

Moreover, Claims 31 and 32—which both depend on Claim 1—present a presumption that the trigger signal is not required to be a word.  *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").  "This presumption is 'especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim.'"  *Retractable Technologies, Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1312 (Fed. Cir. 2011) (Rader, J., dissenting) (citing *SunRace roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003)).  Claim 31 states that "the trigger signal is audible," and Claim 32 states that "the trigger signal includes an audible trigger word."  '599 patent at 9:59-63.  Because these dependent claims add limitations that further narrow Claim 1, specifically, the "audible" and "word" limitations, the presumption of claim differentiation favors a reading where "trigger signal" need not be a word.  *See Digital-Vending Serv. Int'l, LLC v. Univ. of Phoenix, Inc.*, 372 F.3d 1270, 1275 (Fed. Cir. Mar. 7, 2012) ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.") (internal citations omitted); *Retractable*, 653 F.3d at 1312 (Rader, J., dissenting); *Innova/Pure Water, Inc.*, 381 F.3d at 1119 ("[A]ll claim terms are presumed to having meaning in a claim.").

Defendants cite to *Retractable* for the proposition that the presumption of claim differentiation is overcome because "every embodiment and every drawing of the '599 patent exclusively describes voice activation via a 'trigger word.'"  RESPONSE AT 14.  However, as

illustrated above, the specification discloses some examples of inaudible trigger signals, i.e., trigger signals that are not words.  Further, "[t]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc.*, 381 F.3d at 1115).  While the claims must be read in light of the specification, the disclosures within the specification do not overcome the "bedrock principle" that the claims, not the written description, define the invention.  *Id.* at 1312, 1315, 1327 (holding that a baffle may be at a right angle despite no such disclosure in the specification). To do otherwise would be to improperly import a limitation from the specification into the claims.  Thus, *Retractable* is inapplicable under these circumstances; this is not a situation where "a contrary construction [is] dictated by the written description or prosecution history."  *See Retractable*, 653 F.3d at 1305.

Consequently, the Court concludes that a trigger signal is not necessarily a word.  Having resolved the parties' claim scope dispute, the Court finds that no construction is necessary for the term "trigger signal."  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

## IV.    "wireless control"[8]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | use of the media player without hardwired controls |
| | alternatively, control of the media player without hardwired controls |

The central dispute is whether all control of the media player must be wireless. Defendants argue that "wireless control" means "without hardwired controls," which reflects the patent's invention: the ability to control the media player wirelessly, i.e., via voice recognition. RESPONSE AT 15-17.  While Stragent does not dispute that "wireless" means "without hardwired

---

[8] This term is contained in Claims 1, 41 & 76.

controls," Stragent maintains that Defendants' proposed constructions may be misinterpreted to mean that (1) the media player itself cannot have any hardwired controls/connections; and (2) the media player must always be controlled wirelessly.   PLTFF'S BRIEF AT 14-15.   To that end, Defendants clarify that its proposals do not require that all aspects of the media player need be wireless or that all control of the media player is wireless.   RESPONSE AT 17.   Rather, Defendants' constructions simply emphasize that the system "is 'operable' so as to 'enable' the user to control the media player without having to use hardwired controls."   *Id.*

Stragent contends that the term "wireless control" will be easily understood by a jury, and therefore, the term requires no construction.   REPLY AT 8.   The Court agrees.   In general, the parties do not seem to present a claim scope dispute, having clarified arguments within the briefing.   However, to the extent an issue remains, the Court finds that the media player may be equipped with hardwired controls that may control the media player.

As stated above, the preferred embodiment discloses the use of hardwired buttons that may be used to control the media player.   *See supra* SECTION III.   Specifically, buttons may be used to adjust the FM frequency.   *See* '599 patent at 5:44-47; Figs. 4 & 5; *accord id.* at 2:52-53 ("media player may include an iPod®").   The specification discloses the FM frequency-adjusting buttons in conjunction with a method for controlling the media player by wireless means, in this case, via utterances.   *Id.* at 5:31-33 ("a media player in connection with an assembly for receiving utterances").   Thus, as the specification notes, and as Defendants concede, the ability to control the media player via hardwired controls, i.e., buttons, does not preclude the ability to control the media player via wireless controls or voice commands.

The prosecution history further supports such a reading.   In Plaintiff's PCT application, the patentee noted that "any voice command is a means for wireless control."   PCT/US05/41640

(APR. 2005), EX. 2 AT V.2., ATTACHED TO PLTFF'S BRIEF.  Thus, an audible command can control the media player; however the patentee's comment does not preclude the use of hardwired controls to manipulate the media player.   In the examiner's statement for allowance, the examiner commented that the prior art, which used dials, buttons, and touch screens, "only disclosed hardwired control of the media player," contrary to the '599 patent. RESPONSE AT 16 (emphasis in original).  Specifically, the examiner stated that the "the media player [disclosed in the prior art] is not provided for wireless control to generate a corresponding command based on an utterance.  That is, there is nothing that suggests speech recognition for controlling a media player by a command based on an utterance or for wireless control."  REASONS FOR ALLOWANCE AT 2, U.S. PATENT APPL. SER. NO. 12/104,207 (APR. 7, 2011), EX. 19 ATTACHED TO RESPONSE. Not only did the examiner point out that the prior art did not use wireless control at all, but the examiner implied that such wireless control occurred via an utterance.  Such an observation does not preclude the coexistence of hardwired buttons and wireless control of the media player.

Finally, the Court finds that construction of the term "wireless control," as Defendants propose, would confuse the jury.  Defendants' proposals could potentially mislead the jury into thinking that the media player must be void of any hardwired controls.  As stated above, neither the specification nor the prosecution history support such a reading.  Therefore, the Court finds that control of the media player may be conducted by both hardwired and wireless means. Accordingly, the Court finds that no construction is necessary for "wireless control."

## V.   "computer code for verifying the utterance using [utilizing] the speaker"[9]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary | computer code for replaying the utterance for the user who provided the utterance and allowing the user to either accept or reject the utterance |

---

[9] This term is contained in Claims 1, 41, 76 & 96.

Stragent takes issue with Defendants' proposed construction because it unnecessarily imports two limitations, requiring that the computer code: (1) replay the utterance for the user and (2) allow the user to accept or reject the utterance. PLTFF'S BRIEF AT 18. Stragent notes that many of the dependent claims disclose such limitations, and therefore these requirements should not restrict the independent claims. *Id.* at 17-18. Further, Defendants' proposal limits the term to a preferred embodiment disclosed in the specification. *Id.* at 18.

Defendants argue that verifying the utterance requires playback of the utterance in order to confirm the utterance was properly received, and subsequently, feedback from the user to verify that the replayed utterance is correct. RESPONSE AT 25. This two-step process is disclosed in the specification. *Id.* at 26 (citing '599 patent at 5:11-20).

Defendants cite to a portion of the specification that notes the utterance is replayed and then either accepted or rejected in order to verify the utterance:

> In use, the utterance may be verified by replaying the utterance for the user who provided the utterance and allowing the user to either accept or reject the utterance. For example, in playing the utterance back for the user, the user may be prompted to either state "yes" or "no." If the user rejects the utterance, the user may then be prompted to give the utterance again. In this way, the verifying may allow for the adjusting of the received utterance if it is not verified. Of course, any type of verification process may optionally be utilized for verifying the utterance.

'599 patent at 5:11-20. While the majority of Defendants' proposed construction is taken directly from the specification, Defendants' proposal is nonetheless limited to a preferred embodiment of the invention. Moreover, the portion of the specification Defendants cite elaborates that "any type of verification process may optionally be utilized for verifying the utterance." *Id.* at 5:18-20. Thus, the replay and accept/reject limitations Defendants propose unduly limit the claims—contrary to the specification—and therefore the Court declines to

import these limitations into the claims.  *See Arlington Indus.*, 632 F.3d at 1254; *Phillips*, 415 F.3d at 1323 (cautioning against confining claims to preferred embodiments); *Libel-Flarsheim*, 358 F.3d at 906 (refusing to limit the claims to the single embodiment described in the specification).

In addition, the claims simply require "computer code for verifying the utterance."  *See e.g.,* '599 patent at 8:1-2.  The plain language of the claim does not require additional limitations such as replaying, accepting, or rejecting the utterance.  Moreover, many of the dependent claims further limit the independent claims to include the replay, accept, and reject limitations.  For example, Claim 17, which depends on Claim 1 (via intermediary dependent claim 16), recites: "The computer program of claim 16, wherein the computer program product is operable such that a user is allowed to accept or reject the utterance outputted via the speaker."  '599 patent at 9:5-8; *see also id.* at 13:46-49 (Claim 95).  Thus, Claim 17 already narrows Claim 1 by disclosing the additional accept/reject limitation Defendants propose.  Similarly, dependent Claims 96 and 97 iterate the replay limitation: "The system of claim 76, wherein the verifying includes playing a word corresponding to the utterance," *id.* at 13:50-51 (Claim 96) and "The system of Claim 96, wherein the playing includes replaying."  *Id.* at 13:52-53 (Claim 97). Because the dependent claims recite the replay, accept, and reject limitations, the doctrine of claim differentiation creates a presumption that these limitations shall not be read into the independent claims.

Having resolved the parties' claim scope dispute, the Court finds that no construction is necessary for the term "computer code for verifying the utterance using [utilizing] the speaker." *See O2 Micro*, 521 F.3d at 1362.

## VI.    "media player"[10]

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary | any portable software and/or hardware capable of outputting any sort of media |

The parties dispute whether the media player must be portable.  Stragent contends that the media player need not be portable, especially in light of the specification's disclosure that the media player may be built-in to stationary devices, such as servers.  PLTFF'S BRIEF AT 15-16 (citing '599 patent at 2:52-65; Fig. 1).  Stragent further maintains that the claims of the '599 patent sufficiently describe the media player such that no construction is necessary.  *Id.* at 15.

To the contrary, Defendants propose that the patentee acted as its own lexicographer, providing a special definition of media player.  RESPONSE AT 22.  In particular, Defendants point to the specification where the patentee discloses that the media player is portable.  *Id.* at 22-23 (citing '599 patent at 2:52-55).  Moreover, the specification repeatedly discloses embodiments where the media player is an iPod, which is a portable device.  *Id.* at 24-25 (citing 3:15-25; 5:23-24; 5:39; Figs. 5 & 6).

Defendants are correct that the specification identifies an iPod as a type of media player.  However, while an iPod, or something similar, may be the preferred embodiment, the specification does not limit the media player to an iPod or other portable device:

> In the context of the present description, a media player *may* include an iPod®, a portable satellite radio player, and/or any portable software and/or hardware capable of outputting any sort of media [e.g. audible media (e.g. music, news, non-fiction information, fictional stories, etc.), visual media (e.g. pictures, video in the form of movies, news, programming, etc.), etc.].
>
> Still yet, as an option, the media player may be used in conjunction (e.g. *built-in*, retrofitted with, coupled to, etc.) [with] any desired device including, but not limited to a cellular phone, personal digital assistant, etc. (e.g. see, for example, *any of the devices of FIG. 1*, etc.).  Of course, it is contemplated that the media player may further be a stand alone product.

---

[10] This term is contained in Claims 1, 41, 44, 51, 76 & 77.

'599 patent at 2:52-65 (emphasis added).  The portion of the specification cited above states that a media player *may* be an iPod or other portable device, expressing that a media player is not confined to such examples.  Moreover, the disclosure notes that the media player may be "built-in . . . any desired device including . . . any devices of FIG. 1."  Such devices of Figure 1 include a server device and a desktop computer.  *Id.* at 1:64-2:7.  These types of devices are not necessarily portable, and further, the specification articulates that "any of the foregoing devices [server device or desktop computer] in the present network architecture 100, as well as any other unillustrated hardware and/or software, may be equipped with voice control of an associated media player."  *Id.* at 2:4-7.  Thus, the specification contemplates that the media player may be built-in to a non-portable device, such as a server or desktop computer.

Accordingly, to construe "media player" as a portable device would unnecessarily limit the claim language.  Further, the Court finds that "media player" will be easily understood by a layperson.  Having resolved the parties' dispute, the Court concludes that "media player" requires no construction.

## CONCLUSION

For the foregoing reasons, the Court adopts the constructions set forth above.

**So ORDERED and SIGNED this 3rd day of July, 2013.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE